**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

ELLA CLINTON, on behalf of herself and all others similarly situated,

Plaintiff,

v.

SECURITY BENEFIT LIFE INSURANCE COMPANY, a Kansas corporation,

Defendant.

Case No.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. An equity-indexed deferred annuity ("EIA") is a type of fixed annuity that is distinguished by the interest yield return being partially based on an equities index, typically the S&P 500. The general appeal of EIAs is to moderately conservative investors who like having some opportunity to earn a higher investment return than what's available from traditional fixed-rate annuities, while still having some protection against downside risk. An annuity is essentially an investment contract with an insurance company, traditionally used for retirement purposes. The investor receives periodic payments from the insurance company as returns on the investment of premiums paid. There is an accumulation period when the premiums paid earn interest in accordance with the terms of the annuity contract, followed by a payout period.

2. In the case of EIAs, also commonly referred to as indexed annuities, part of the interest rate earned is a guaranteed minimum, typically 1% to 3% paid on 90% of premiums paid. The other part is linked to the specified equities index. Earnings from EIAs are usually slightly higher than traditional fixed-rate annuities, lower than variable-rate annuities, but with better downside risk protection than variable annuities usually offer. A key feature of EIAs is the participation rate, which basically limits the extent to which the annuity owner participates in market gains. If the annuity has an 80% participation rate, and the index to which it is linked shows

a 15% profit, the annuity owner participates in 80% of that profit, realizing a 12% profit.

3. The market for EIAs is extremely large and growing in Florida and across the country. In 2001, EIA manufacturers had sales of $1.59 billion in the third quarter, up 31% from the same period in 2001, according to the Advantage Group, St. Louis, which tracks the industry. Sales were $4.45 billion through the year's first nine months, putting the industry on track to increase sales for a sixth consecutive year, said Jack Marrion, president and founder of the company. Marrion said the greatest sales growth was in products offering bonuses of 5% or more of the initial premium. According to Investment News, by 2018, the sales of indexed annuities had grown to $57.6 billion, according to LIMRA Secure Retirement Institute.

4. In August of 2010, Guggenheim Partners LLC acquired Security Benefit, rescuing the failing insurance company from the brink of insolvency. Soon thereafter, with the active assistance of an independent marketing organization known as Advisors Excel, Security Benefit devised and implemented a fraudulent racketeering scheme to exploit the national market for EIAs and formed this Enterprise to carry out the fraudulent scheme. EIAs have traditionally featured annual account value credits linked to well-known, third-party stock indices (such as the Standard & Poor's 500 or the Russell 1000), and which credited a percentage of account values with a portion of increases in the underlying index (known as the "participation rate") or limited the amount of any account value increase by an annual limit (known as the "cap" rate).

5. Instead of utilizing a reputable index such as Standard & Poor 500, Security Benefit's fraudulent scheme included the development and marketing of a series of misleading and deceptive EIAs purporting to provide above-market returns through purported "uncapped" 100% participation in the gains in certain "proprietary" indices artificially engineered specifically for use in these new EIAs. Security Benefit's marketing of "uncapped" and "100% participation" in the returns on these proprietary indices was false and misleading without a clear statement that they were in fact designed to have much lower returns than the stock indices traditionally used in EIAs. This fraudulent scheme could only be accomplished with the assistance of third parties such as Advisors Excel.

6. In furtherance of this fraudulent scheme, Security Benefit sold its "Secure Income Annuity" and "Total Value Annuity" products (collectively, the "Annuities") to Plaintiff and thousands of other consumers in Florida and across the country, offering them the purported ability to earn favorable positive returns by allocating some or all of their account values to the proprietary indices that supposedly tracked the performance in certain equity or commodity markets, including but not limited to the so-called "Morgan Stanley Dynamic Allocation Index Account" (the "MSDA Index") for the Secure Income Annuity, and the so-called "Annuity Linked TV Index" (the "ALTV Index") or the BNP Paribus High Dividend Plus Index (the "HD Plus Index") for the Total Value Annuity (collectively, the "Synthetic Indices").

7. Using uniformly misleading marketing materials and illustrations to implement the scheme, Security Benefit deceptively illustrated the performance of the Synthetic Indices as capable of producing double-digit returns to the purchasers of the Annuities (in particular through the use of a grossly misleading, cherry-picked "backcasting" of the indices' hypothetical performance, as if the Synthetic Indices had existed in the past). Security Benefit enhanced its depicted performance of the Synthetic Indices by contrasting their illustrated performance with less-rewarding returns using "capped" non-proprietary indices, such as the S&P 500 or the Russell 1000. Security Benefit did so with present knowledge that they designed the Annuities not to perform as represented, especially given the embedded costs, risks and product features of the Annuities.

8. Security Benefit further misrepresented the nature, attributes and performance of the Synthetic Indices in so-called "Statements of Understanding" delivered to and signed by each prospective purchaser of the Annuities and by each insurance agent who procured the sale.

9. Once consumers purchased the Annuities, they were locked into them by onerous surrender penalties, bonus claw-back provisions, and the very structure of the Synthetic Indices themselves, which were designed to credit no interest until the end of fixed periods ranging from two to five years.

10. As Security Benefit knew at the time, the Synthetic Indices by design would not and could not perform as represented, but instead would generate virtually ***zero*** returns over the periods in which the consumer is locked into them under the terms of the Annuities.

11. Through this fraudulent racketeering scheme, Security Benefit wrongfully induced Plaintiff and thousands of similarly situated individuals to purchase the Annuities through materially false and misleading representations and half-truths. Security Benefit's perpetration of this overarching scheme was conducted as part of an Enterprise that has committed and is committing an ongoing pattern of racketeering activity such that their conduct violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Plaintiff therefore seeks, on behalf of herself and a nationwide class, compensatory and treble damages, attorneys' fees and costs, and other appropriate forms of equitable or injunctive relief to halt and remedy Security Benefit's scheme to use the Synthetic Indices to induce the sale of the Annuities to United States residents.

**THE PARTIES**

12. Plaintiff Ella Clinton ("Plaintiff Clinton") is a citizen and resident of the State of Florida, is over the age of 18 and is otherwise *sui juris*.

13. Defendant Security Benefit is a life insurance company organized under Kansas law, with its principal place of business located at 1 Security Benefit Place, Topeka, Kansas, 66636. Security Benefit is thus a citizen of the State of Kansas.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c). This Court also has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. Plaintiff further alleges class claims on behalf of a nationwide class that includes persons who are minimally diverse from Security Benefit and presents aggregate claims in excess of $5,000,000. This Court accordingly has subject matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

15. Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff Clinton resides in this District, Security Benefit maintains substantial operations in this District; thousands of Class Members either reside or did business with Security Benefit in this District; Security Benefit engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Security Benefit entered into transactions and received substantial profits from consumers who reside in this District.

## COMMON ALLEGATIONS

### A. Indexed Annuities

16. A deferred annuity is a contract between the annuity owner and an insurance company in which the owner makes an up-front payment of premiums to the insurance company that are deposited into an accumulation account (the "Account Value") and left on deposit for a number of years. During this deferral period, the earnings on the annuity owner's premiums are tax-deferred.

17. Equity-indexed deferred annuities offer owners the option of allocating the Account Value among several different indexes, theoretically empowering the owner to make his or her own investment risk-reward determination. Owners of EIAs select from a limited number of investment options permitting them to allocate whole or part of their Account Value to an account crediting a fixed, guaranteed but modest interest rate, or to an account crediting interest determined by changes in a designated "index" based on the prices of a collection of equities, bonds, commodities or other assets.

18. Because deferred annuities involve a long-term investment decision (in which the owner's premiums are essentially locked up for years due to hefty surrender charges and other restrictions), the represented performance of the annuity contract (i.e., how much the annuity owner can expect to receive in the future as a lump sum or a stream of periodic payments) is of paramount importance to the consumer. To make an informed decision about deferred annuities and the relative attractiveness of the annuities being sold by different insurance companies, it is

critically important to consumers that the issuing insurance companies fully and truthfully disclose all features and risks associated with their annuities, including all material information necessary for prospective purchasers to understand the applicable product costs, charges, anticipated rates of return and penalties.

**B. The Indexed Annuity Marketplace**

19. Insurance companies go to great lengths to extoll the supposedly exceptional performance of their annuities through a plethora of features and purported benefits calculated to portray superior investment returns and future account value growth. For example, although in a traditional deferred annuity contract the annuity's account value increased based only on the amount of interest the company credits each year, in the mid-1990's insurance companies began selling deferred ***equity-indexed*** annuities, which tie account value growth to the performance of an established equity index (such as the S&P 500 index or the Russell 1000). This feature purportedly allows the annuity owners to share in the long-term increases in the equity markets while their investment is locked into the annuity.

20. The link between index performance and account value was typically constrained, however, by non-guaranteed limits unilaterally imposed by the insurance company. Some products, for example, "capped" the credited index appreciation at a maximum fixed percentage (8% for example) such that the annuity account value would be credited with no more than a set percentage no matter how great the given index increase. Other annuity products limited the consumer's "participation" in a given index's performance, for example, crediting to the account value only a specified percentage (65% for example) of the index's annual return. Many EIA products imposed ***both*** cap levels and percentage participation rates on the account value's share of the chosen index's upside appreciation.

21. In short order, therefore, the "cap" levels and "participation rates" associated with equity-indexed deferred annuities became key selling points as insurance companies sought to

entice consumers with higher cap levels and participation rates. The higher the cap and participation rate, the more the annuity shares in any appreciation of the index.

22. As EIA sales soared, insurance companies increasingly used sales illustrations as a weapon to depict anticipated future performance of their respective annuities. These illustrations, used as sales presentation documents, depict projected future annuity values on both a "guaranteed" and a "current" basis. Such illustrations, which were first introduced to promote sales of traditional and universal life insurance products, unfortunately have a long and well-established history as deceptive, misleading and abusive marketing tools allowing companies to misrepresent and overstate the anticipated future performance of insurance products.

23. By the mid-2000s, as interest rates declined to historically low levels, insurance companies faced declining returns on their invested assets and began to reduce the current caps and participation rates on their EIAs.

**C. The Fraudulent Scheme to Develop and Market the Annuities**

24. By the end of 2009, Security Benefit was left with a very weak solvency ratio after it wrote substantial annuity business and acquired a mutual-fund manager with $20 billion in assets under management, just after asset prices plunged due to the financial crisis. Consequently, Security Benefit was forced to recapitalize its business.

25. In July 2010, Guggenheim Partners LLC ("Guggenheim"), a private equity financial services firm with more than $190 billion in assets under management, stepped in and acquired Security Benefit for $400 million. The Security Benefit acquisition was part of Guggenheim's strategic plan to acquire financially strapped, vulnerable insurance companies. Guggenheim promptly demutualized Security Benefit, so that its dividends would be paid to Guggenheim rather than its policyholders.

26. When announcing the acquisition, Guggenheim's managing partner stated that "[t]his transaction enables us to accelerate Security Benefit's growth given the marketplace's increasing demand for robust retirement programs and investment strategies. We believe that

Guggenheim Partners brings resources and product development capabilities that will be advantageous to Security Benefit's current and future clients."[1]

27. Soon after the acquisition, Guggenheim deployed Security Benefit to generate short-term cash by designing, developing and marketing a series of EIAs falsely portrayed as "uncapped" retirement products with unlimited participation in the performance of proprietary indices, which would provide above-market, long-term returns while purportedly protecting annuity owners from market volatility.

28. To implement this fraudulent scheme, Security Benefit partnered with Advisors Excel, an independent marketing organization, to develop and roll out the Secure Income Annuity in 2011, and the Total Value Annuity in 2012 (the "Annuities").

29. Todd Boehly, the Chairman of Security Benefit, and Cody Foster, co-founder of Advisors Excel, attended Washburn College together. Security Benefit and Advisors Excel partnered to develop the Annuities and to market them through an exclusive network of four "elite" marketing organizations: Advisors Excel, Creative Marketing, Gradient Financial and Impact Partnership.[2]

30. The Annuities are marketed and sold as retirement or investment vehicles and offer prospective annuity owners the option to purchase the Guaranteed Lifetime Withdrawal Benefit Rider (the "GLWB Income Rider"), as well as other riders purportedly providing benefits for nursing home care and terminal illness protection. The GLWB Income Rider, which can only be purchased at the same time as the underlying Annuities, purports to provide annuity owners with a lifetime annual income during their retirement years, while imposing a rider charge that is applied as a percentage amount deducted each year from the annuity's Account Value.

---

[1] https://www.guggenheimpartners.com/firm/news/guggenheim-partners-announces-definitive-agreement (last visited on November 16, 2019).

[2] https://www.globenewswire.com/news-release/2012/04/02/1218653/0/en/Security-Benefit-Launches-Innovative-Total-Value-Annuity.html (last visited on November 16, 2019).

31. In addition, the Annuities contain provisions assessing (a) an Initial Annual Spread, which is a percentage amount deducted each year from the annuity's Account Value, (b) an Initial Participation Rate, which is the percentage of the change in the designated index credited to the Account Value at the end of a specified term, and (c) a percentage cap on interest credited to whatever portion of the Account Value is allocated to the S&P 500 index account.

32. The Annuities also provide for a "Bonus" added to the Account Value, ranging from 8-10% of the initial premium paid by the owner. A specified percentage of the Bonus is recaptured, however, if the Annuity is surrendered or if withdrawals exceeding 10% of the accumulated Account Value are taken during the first 10 years after the Secure Income or Total Value Annuity is issued.

33. Security Benefit rolled out the Secure Income Annuity in March of 2011, describing the annuity as a long-term, low-risk product designed for retirement savings:

> "This annuity is designed for policyholders who intend to hold it for the long-term and who want their interest linked to the stock market without the risk of losing money in the stock market…." Some of the basics of the annuity are that it can be bought by individuals up to the age of 80. It can be purchased through a traditional or Roth IRA, which works well for individuals wanting to rollover money…when they retire or separate from service….
>
> "One of the exciting features of Secure Income Annuity is the optional Guaranteed Lifetime Withdrawal Benefit (GLWB) that can be selected at purchase….the effect of the [GLWB] roll-up and the annual increase in the lifetime withdrawal percentage working together can have a significant impact on the amount of lifetime annual income the policyholder can take and can help people be better prepared for their retirement years…"

"Security Benefit Debuts New Fixed Index Annuity With Optional Guaranteed Income for Life."[3]

34. The Secure Income Annuity was an immediate success. According to Advisors Excel, the Secure Income Annuity "quickly became the No. 1 selling fixed index annuity in the industry gathering more than $7 billion in premium for AE [Advisors Excel] producers since its

---

[3] https://www.winkintel.com/2011/03/security-benefit-debuts-new-fixed-index-annuity-with-optional-guaranteed-income-for-life/ (last visited on November 16, 2019).

release."[4] Nonetheless, Security Benefit was not satisfied with this meteoric rise in the EIA marketplace.

35. In its haste to gain an immediate foothold in the EIA market, Security Benefit had designed the Secure Income Annuity to offer a crediting option tied to the MSDA, a pre-existing proprietary index developed by Morgan Stanley. Recognizing that it could achieve even more aggressive represented performance by developing its own synthetic index, Security Benefit enlisted the assistance of Advisors Excel and EAM Partners LP to devise the ALTVI.

36. Insurance companies issuing EIAs do not purchase positions in the indices underlying the equity-linked crediting options. Instead, the issuing company establishes an "options budget" each year equal to the amount the company would otherwise credit under the operative fixed interest crediting option. The company then acquires options to hedge its obligation to credit interest to the equity-linked account based on movements in the selected index and establishes "caps" or "participation" rates based on the terms of the options purchased by the company. Consequently, the costs to acquire hedging options, which are tied to the volatility associated with the assets encompassed by the particular index, determine the level of the established "caps" or "participation" rates. For this reason, the lower option costs associated with an index having lower volatility allows the company to offer higher "caps" and "participation" rates.

37. As the next step in its fraudulent scheme, Security Benefit and its partners developed the ALTVI as a crediting option for the new Total Value Annuity designed as a successor to the Secure Income Annuity. As a mechanism to illustrate even more aggressive yet unachievable projected future returns, Security Benefit incorporated several design features in the ALTVI. First, Security Benefit tethered the ALTVI to the "Trader Vic Index" which tracks a collection of commodities and other futures and added a "volatility overlay" to reduce anticipated

4 https://www.advisorsexcel.com/for-financial-professionals/planning/proprietary-productdevelopment.Php.

volatility. In addition, Security Benefit designed the so-called "5-Year Annuity Linked TVI Index Account" allocation option to credit interest only at the end of a designated five-year period while prohibiting any re-allocation during the five-year lock up period (and simultaneously imposing severe penalties on withdrawals during the lock up period).

38. This design allowed Security Benefit to reduce its own hedging costs, permitting the company to acquire cheaper options due to (1) the reduced volatility associated with the gerrymandered assets tracked by the synthetic ALTVI Index and (2) the fact that these options only needed to be purchased every 5 years instead of annually. At the same time, as explained below, Security Benefit selected non-representative benchmark periods during which the Trader Vic Index had reported aberrational high gains in order to project future returns Security Benefit knew to be unattainable.

39. As the next move in its ongoing scheme, Security Benefit launched the Total Value Annuity in 2012, extolling the new product as a successor to the Secure Income annuity designed for accumulation and retirement savings:

> "Our Total Value Annuity targets savers with an eye toward asset accumulation and we believe is a sensible part of our retirement savings and income product strategy," said Doug Wolff, President, Security Benefit Life. "Our TVA extends Security Benefit's fixed index annuity product line that includes the [Secure Income Annuity] and has rapidly become one of the top four selling products in the industry, positioning Security Benefit as one of the fastest growing fixed index annuity providers in the nation."
>
> The Total Value Annuity comes as close to fully addressing the retirement challenge as any product on the market…The Total Value Annuity was designed to protect retirement savings and provide interest on those savings.

"Security Benefit Launches Innovative Total Value Annuity"[5]

40. Later, in January 2015, Security Benefit announced the introduction of two new index accounts based on the HD Plus Index:

> The HD Plus Index is designed to find high-dividend stocks and attempt to deliver

[5] https://www.globenewswire.com/news-release/2012/04/02/1218653/0/en/Security-Benefit-Launches-Innovative-Total-Value-Annuity.html (last visited on November 16, 2019).

> strong returns with a reduced level of volatility and risk. The rules-based strategy starts with a dividend-focused stock portfolio and adds a yield enhancement overlay as well as a risk reduction overlay.
>
> Every month, the HD Plus Index selects stocks that have a high probability of consistently paying strong dividends in the future. On average, the HD Plus Index is typically comprised of 75 to 80 highly liquid, non-financial U.S. stocks. The Index also seeks to limit volatility through cash exposure that is actively adjusted to achieve a targeted volatility rate of 6 percent, which is less than half of the S&P 500® Index's historical volatility.

"Security Benefit Debuts New Crediting Options for Total Value Annuity"[6]

41. As planned, Security Benefit uniformly represented to prospective purchasers that, unlike other annuities, their Annuities provide contract owners with the opportunity to receive ***uncapped***, ***100% participation*** in the Synthetic Indices. Thus, in contrast to the severely capped S&P 500 index crediting option, Security Benefit presented consumers with the purported opportunity to link some or all of the Account Value in the Annuities to "uncapped," 100% participation in the Synthetic Indices.

42. Security Benefit represents to prospective purchasers that the Synthetic Indices are based on underlying indices reflecting changes in the prices of a diversified collection of futures contracts (including equities, commodities, global currencies and interest rates).

43. Security Benefit and its associates prepared and disseminated uniform sales illustrations and marketing materials promoting their Annuities and the Synthetic Indices to induce prospective purchasers to purchase them. These sales illustrations are computer-generated documents containing columns depicting projected future Account Values for the Annuities based on assumed allocations of the values among specified interest crediting options, including allocations to the Synthetic Indices.

44. The Security Benefit marketing materials include brochures describing the purported features of the Annuities. The marketing brochures also contain side-by-side or seriatim

---

6 https://www.globenewswire.com/news-release/2015/01/12/696708/10114983/en/Security-Benefit-Debuts-New-Crediting-Options-for-Total-Value-Annuity.html (last visited November 17, 2019).

comparisons depicting the potential future Account Values of the Annuities based on assumed allocations to the available interest crediting options.

45. The projected future performance of the equity-linked crediting options is premised on represented historical returns of the applicable index. To ensure uniformity, the sales illustrations and marketing brochures are all prepared by Security Benefit and distributed to prospective purchasers through sales agents or brokers who use these marketing materials to sell the Annuities.

46. Security Benefit's objective was to make the Annuities appear more attractive by steering purchasers into the index account options linked to the Synthetic Indices. The Security Benefit sales illustrations and marketing brochures represent that the potential returns for account values allocated to the "uncapped," 100% participation Synthetic Indices are substantially higher than the returns on account values allocated to the "capped" S&P 500 index option.

47. Indeed, to drive annuity owners into its own Synthetic Indices, Security Benefit designed the Annuities to throttle the illustrated performance of the S&P 500 index options with extremely low cap rates of 2.5-3.5%. This paltry cap rate, which was lower than the caps and participation rates being offered by other EIA issuers, was intentionally chosen by Security Benefit to induce annuity owners to allocate a large percentage of their account values to the Synthetic Indices (which were more lucrative for Security Benefit and less favorable to the owners of the Annuities).

48. The low caps and participation rates that Security Benefit imposed on its S&P 500 index option, coupled with stiff surrender penalties, multi-year index terms and bonus claw back penalties also served to lock annuity owners into the Synthetic Indices. The Annuities contain a ten-year surrender charge schedule with penalties as high as 12% and a corresponding ten-year bonus recapture provision that claws back 100% of the purported "premium bonus" for the first six contract years.

49. Furthermore, the Synthetic Indices did not mature and credit interest until the end of a specified Index Term, usually 2 or 5 years, meaning that the Account Values would not be

credited with interest based on changes in the index until the expiration of the specified Index Term. Security Benefit annuity owners thus faced severe financial penalties if they surrendered their Annuities and had no financially viable escape route from the Synthetic Indices because the alternative S&P 500 option offered by Security Benefit carried a significantly below-market, unfavorable cap rate.

50. Because the ALTV Index is used exclusively with the Total Value Annuities, prospective purchasers have no pre-existing or independent knowledge about the index. Therefore, any decision by an annuity owner to allocate his or her Account Values to the ALTV Index necessarily results from reliance on the representations and omissions made by Security Benefit in its sales illustrations, marketing materials, and contract documents. The same is true for the MSDA Index, an obscure proprietary index unknown to the consumers comprising Security Benefit's target market, and for the HD Plus Index, which was not created until July 2014 and therefore had little, if any, past results from which to judge any future performance even if that information was supplied to prospective purchasers.

51. Security Benefit's aggressive tactics and misleading sales scheme yielded immediate financial rewards for Security Benefit and its parent, Guggenheim Partners. After introducing the Secure Income Annuity, Security Benefit rocketed from unranked on January 1, 2011, to number one in Indexed Annuity Sales as of December 31, 2011. And the follow-on Total Value Annuity replaced the Secure Income Annuity as the number one selling product in the EIA marketplace. According to Advisors Excel ("AE"), "Through the same partnership, we introduced the Total Value Annuity in 2012, garnering both premium and media attention by ousting the SIA to grab the No. 1 selling FIA spot in the third quarter of 2012 and generating nearly $3 billion in premium for AE producers since then."[7]

[7] https://www.advisorsexcel.com/for-financial-professionals/planning/proprietary-productdevelopment.Php.

### D. Security Benefit Misrepresents the Features and Performance of the Annuities

#### 1. <u>Misleading and Incomplete Sales Illustrations and Marketing Brochures</u>

52. As alleged above, to induce sales prospects to purchase the Annuities and direct their premium dollars to the Synthetic Indices, Security Benefit prepares and disseminates misleading sales illustrations and marketing materials depicting that the "uncapped," 100% participation feature of the Synthetic Indices will potentially generate outsized above-market returns – with projected annual returns as high as 8% or higher – far exceeding the comparative performance of crediting options based on "capped" indices like the S&P 500.

53. The Security Benefit illustrations and marketing materials are deceptive and materially misleading for a variety of reasons. The Synthetic Indices are not established reference indices, like the S&P 500. To the contrary, they are proprietary "indices" employed by Security Benefit as a mechanism to depict inflated, unattainable future returns using the artifice of purported "uncapped" 100% participation.

54. To create the appearance that the ALTV Index is a legitimate independent index developed by a reputable financial institution, Security Benefit touts the ALTV Index as owned by The Royal Bank of Scotland. However, ALTV Index is, in reality, developed by Security Benefit for exclusive use in connection with the Total Value Annuities.

55. Moreover, Security Benefit intentionally employed the Synthetic Indices as a fraudulent artifice to overstate and misrepresent the projected future performance of the Annuities and to intentionally induce prospective purchasers and owners of the Annuities to allocate their Account Values to the Synthetic Indices.

56. To achieve the unattainably high future returns depicted in its illustrations and marketing materials, Security Benefit cherry-picked both the composition of the Synthetic Indices and the historical period used as the benchmark to project the future illustrated values of the Annuities. Security Benefit used such so-called "backtesting" (or "backcasting") to project future

returns based on the non-representative historical performance of a hypothetical collection of assets to a past period beginning years ***before the Synthetic Indices even came into existence***.

57. At the same time, though, Security Benefit intentionally selected Synthetic Indices that produce near-zero returns, simultaneously thereby reducing its own hedging costs. Thus, the Synthetic Indices were heavily concentrated, either by origin or periodic rebalancing, in cash or cash-like commodities or assets with expected returns close to zero. Security Benefit further eroded even the meager expected returns by spreads deducted by the index managers from the actual annual performance and structuring the Synthetic Indices as "excess return" vehicles (meaning that the actual gross returns are reduced by an amount based on the risk-free rate).

58. At the same time that Security Benefit cherry-picked the benchmark reference periods to correspond with years when the index asset components exhibited non-representative gains, it inconsistently assumed a 100% participation rate over the entire backcast period even though the hedging costs associated with such market conditions would preclude full participation in the out-sized returns.

59. In short, Security Benefit knowingly and falsely rigged the illustrated future performance of the Annuities by backcasting performance of the artificial, Synthetic Indices and applying unsupported assumptions – deliberately depicting future returns in its sales illustrations and marketing materials that it knew could not in fact be replicated going forward.

60. Security Benefit's uniform marketing materials contained false projections of the future returns potentially achieved through allocation of annuity values to the "no cap" crediting options linked to the Synthetic Indices. These uniform marketing materials also contained misleading comparisons falsely depicting that the future returns available through the Synthetic Indices would be substantially more favorable than those achieved using established indices like the S&P 500.

61. For example, a Security Benefit marketing brochure from 2014 contained the following graph purporting to compare the performance of a Secure Income Annuity allocated entirely to the MSDA Index to one allocated entirely to the S&P 500, for the period from December 1999 through December 2013:




62. According to this projection, a Secure Income Annuity funded with an initial $100,000 premium payment would produce a gain of $97,000 over the 14-year period (an annual return of about 7%), while the same annuity allocated to the S&P 500 would have produced a gain of only $27,867.

63. Again, these unreasonably aggressive backcasted returns for the MSDA Index depicted in the Security Benefit marketing materials stand in sharp contrast to the index's actual real-world performance. The following chart shows the actual comparative performance of the MSDA Index in juxtaposition to the performance of the S&P 500, Dow Jones and NASDAQ indices over the period from 2014 through 2018:




64. Similarly, despite hyping the HD Plus Index as one that would produce strong returns with a reduced level of volatility and risk, as shown below in blue, the HD Plus Index's actual performance compared to the Dow Jones and the S&P 500 Indices from July 2014 (when the HD Plus Index was created) until the present shows a different, much bleaker picture:



65. Security Benefit was able to represent the favorable returns for the Synthetic Indices depicted in its misleading illustrations and marketing materials only by using selectively engineered backcasting techniques to misrepresent the expected future performance of the rigged Indices. Security Benefit knew that the illustrated future returns for the Synthetic Indices based on its intentionally distorted backcasting models was impossible to achieve because standard economic models using recognized statistical methods (such as the monte carlo analysis) demonstrate that the expected returns for the assets underlying the Synthetic Indices are nearly zero once the spreads and costs of the Annuities were taken into account.

66. Security Benefit's pernicious use of the spiked Synthetic Indices has had a particularly deleterious impact on annuity owners who purchased the Annuities with the GLWB Income Rider. Security Benefit represents that the GLWB Income Rider "is designed to help address longevity risk by providing you with a guaranteed stream of income you cannot outlive."[8] Nonetheless, according to Security Benefit's marketing materials, the GLWB Income Rider provides a "Lifetime Annual Income" based on an "Income Benefit Base … equal to your purchase payments, plus the bonus on purchase payments in the first year, plus the Stacking Roll-up, reduced for partial withdrawals…. The Stacking Roll-up is calculated by adding together the weighted interest rates applied to your Account Value with the guaranteed 4% stacked on top" applied each contract anniversary. The actual Lifetime Annual Income amount is determined as a percentage of the Income Benefit Base dependent on the age at which the owner begins taking the Lifetime Annual Income.

67. There are numerous restrictions undermining the true value of the GLWB Income Rider. For example, withdrawals taken before the Lifetime Annual Income begins or any "Excess Withdrawals" exceeding the Lifetime Annual Income Amount will reduce or potentially eliminate the entire benefit available under the GLWB Income Rider. These restrictions are obscured by the

[8] https://www.sbelitepartners.com/products/total-value-annuity.aspx (last visited on November 16, 2019).

confusing prolix language of the GLWB Income Rider itself, which contains a plethora of interrelated defined terms.

68. However, even if annuity owners scrupulously comply with these inadequately disclosed restrictions, those who allocate a portion of their Account Values to the Synthetic Indices will not receive the illustrated Lifetime Annual Income because the Synthetic Indices are designed and administered to generate near-zero returns that are, in turn, eroded by annual spreads and the Income Rider charges (an initial annual fee equal to .95% of the accumulated Account Value which can increase to 1.80%).

69. In short, Security Benefit knowingly misrepresented the performance of the Annuity crediting options by using Synthetic Indices deliberately designed to generate ***near-zero*** long-term returns to the annuity owner, through materially false and misleading backcasted demonstrations of the purported advantages of allocating all or a portion of the Account Value of the Secure Income or Total Value Annuity to those crediting options.

70. As Security Benefit knew and anticipated, the actual returns associated with the Synthetic Indices have in fact hovered near zero, lagging far below the returns associated with legitimate, non-proprietary indices like the S&P 500 or the Dow Jones Industrial Average.

71. Regulators and regulatory bodies, including the National Association of Insurance Commissioners (the "NAIC"), have recognized the potentially misleading nature of back-casted proprietary indices used to illustrate or promote annuities. For example, the following Bulletin issued by the Iowa Insurance Commissioner to insurance companies issuing annuities in Iowa highlights the very abuses associated with the Annuities:

> The Division has observed that some IMOs are aggressively promoting indexed annuities in potentially deceptive manners.
>
> First, IMOs are emphasizing high-interest lifetime withdrawal benefit riders. Some of the advertising claim the withdrawal benefit rider has an annual rate of return, *e.g.*, "client earns 8%." This statement is misleading if the consumer is not equally informed of the restrictions imposed by the rider.

> Second, the Division reviewed advertisements on annuity products in which the advertisements offer "uncapped" rates of return. …[I]f the advertising is viewed by a consumer, it has the capacity to contribute to inflated consumer expectations of future performance of the annuity product….[I]n reality, the referenced rate is actually limited by spreads, participation rates, or the design of volatility controls, significantly reducing the actual return. The use of "uncapped" terminology without additional disclosures of limitations is misleading….
>
> Similarly, some marketing materials depict charts of recently developed "proprietary indices," which did not exist during the illustrated time frame, but are back-casted and hypothetically demonstrate how they would have outperformed traditional indices. … Using these hypothetical performance charts is misleading if they, directly, or indirectly through subsequent representations by producers, are used to project future performance and contribute to inflated consumer expectations.

"Bulletin 14-02" issued September 15, 2014.

72. Similar concerns about the use of back-casted proprietary indices in sales illustrations and marketing materials were voiced by New York Life, MetLife and Northwestern Mutual in submissions to the NAIC:

> Many market participants utilize the practice of calculating hypothetical historical returns. These hypothetical look back calculations take into account the past performance of the underlying index, but not interest rates, volatility or option prices, which are drivers of the non-guaranteed elements. In certain economic environments, the hypothetical look back approach may allow maximum illustrated rates that are not appropriate for general account life insurance policies and, if used improperly, could be misleading to purchasers….

Statement to NAIC on "Actuarial Guidelines on IUL Illustrations" dated September 5, 2014.

73. Finance experts have acknowledged the actual and potential abuses stemming from backtested projections, including those made by Security Benefit using the ALTV Index, resulting from the selection of unrepresentative benchmark time periods, overfitting, data mining, volatility filters and similar assumptions. *See e.g.*, G. Deng, C. McCann and M. Yan, "Structured Products and the Mischief of Self-Indexing," The Journal of Index Investing (Spring 2017); O. Sarfati, "Backtesting: A Practitioner's Guide to Assessing Strategies and Avoiding Pitfalls," CBOE 2015 Risk Management Conference.

**E. Misleading and Incomplete Statements of Understanding**

74. To ensure uniformity in sales presentations, Security Benefit requires that each purchaser of a Secure Income or Total Value Annuity acknowledge and sign a "Statement of Understanding" ("SOU"). While Security Benefit does so as a defensive maneuver, in this instance the SOU ensures the consistency of Security Benefit's misleading representations regarding the Synthetic Indices.

75. Each Security Benefit SOU purports to describe the nature, attributes and operation of each interest crediting option available to the annuity owner, including the Synthetic Indices. These descriptions are critically important because the interest crediting allocation made by the owner will determine the future returns creating growth in the Account Value, which is the most critical purported benefit of the Secure Income or Total Value Annuity. Where the owner has purchased the GLWB Income Rider, the importance of the future rate of return is magnified because the Stacking Roll Up feature, which determines the amount of Lifetime Annual Income available to the owner, is tied to the level of accumulated Account Value.

76. Furthermore, the standardized disclosures describing the Synthetic Indices contained in the SOU are of paramount importance because this information, coupled with the illustrations projecting the future performance of the Synthetic Indices and the descriptions in the marketing brochure, are as a practical matter the only information about the Synthetic Indices conveyed or reasonably available to prospective purchasers of the Secure Income or Total Value Annuities.

77. Given the complexity of the Annuities, which are opaque at best, incomplete instruments that obfuscate the operative provisions through a maze of complicated and inter-related defined terms, prospective purchasers need accurate, adequate and clearly disclosed information about the Synthetic Indices presented in an understandable format explaining the true costs and values associated with the interest crediting options tied to those indices.

78. Rather than providing the information necessary for a consumer to make an informed decision whether to purchase the Annuities or to allocate funds to an account tied to

performance of the Synthetic Indices, the SOUs contain misleading information and fail to disclose material information about the Synthetic Indices.

1. **The SOU for the ALTV Index**

79. The uniform Security Benefit SOU represents that the ALTV Index is based on the Trader Vic Index ("TVI"), which is described as "a published index on Bloomberg." The SOU further represents that the TVI "was launched by the Royal Bank of Scotland N.V. and EAM Partners LP" and that the Royal Bank of Scotland "serves as the calculation agent for the TVI and the Annuity Linked TVI Index." This description is a misrepresentation by omission. It fails to disclose that the ALTV Index in fact was developed by Security Benefit in collaboration with Advisors Excel and the Innovation Design Group, who are contracted to sell the Annuities and Alpha Artists LP which holds an exclusive license to distribute the ALTV Index.

80. The Security Benefit SOU describes the ALTV Index as an "index that is based on the Trader Vic Index Excess Return Index (TVI) modified by an index cost fee and a volatility control overlay." The ALTV Index SOU does not disclose or explain that, as an excess return index, the actual returns of the TVI will be reduced not only by the 1.25% index cost spread, but also by an additional amount corresponding to the risk free rate of return. Furthermore, because the collection of commodities cherry-picked for the ALTV Index already have an expected near-zero return, deduction of the risk free rate has a far greater adverse impact on performance than would be the case for a traditional excess return index, which would have an expected gross annual return closer to 7-9% before reduction by the risk free rate (of about 1%).

81. The Security Benefit Annuities carry multiple spreads, costs and performance dampening features referenced at disparate locations throughout the prolix SOU and other contract documents that operate collectively to essentially offset the already below-market returns of the ALTV Index. The collective impact of these spreads and charges – which include the annual spread deducted at the index level, the excess return reduction, the annual spread deducted by Security Benefit and the fact that interest is not credited until the end of the applicable Index Term – is not meaningfully disclosed in the ALTV Index SOU or the other standardized contract documents.

82. Similarly, the SOU fails to disclose the operation, impact or import of the "volatility control overlay." The volatility control overlay has at least two effects, neither of which is disclosed or explained in the ALTV Index SOU. First, the volatility control overlay operates to effectively reduce the participation rate when the TVI is volatile. Because there already is a 0% floor on the credited interest rate, the owner actually benefits from volatility, which translates into an effective higher participation rate in higher-yielding assets. When the index is less volatile, the volatility control overlay provides only minimal additional positive performance.

83. In addition, the volatility control overlay impacts the index cost spread, scaling the fee higher when volatility is lower and scaling the fee lower with increased volatility. These changes in the index cost fee tend to offset any positive impact of the changes in participation rates resulting from the volatility control overlay.

84. None of these material facts are disclosed in the SOU. To the contrary, the SOU falsely states that "[t]he volatility control overlay reduces the impact of a fall in price, as well as increases in the price of the TVI." There is minimal or no impact on the Total Value Annuities based on a fall in the level of the TVI because the Total Value Annuities have a 0% floor on the credited interest rate. On the other hand, the volatility control overlay does reduce the positive impact of an increase in the value of the TVI. The ALTV SOU misleadingly suggests that the volatility control overlay has a symmetrical impact on performance of the ALTV Index credits when it does not.

85. The SOU also represents that "[b]ecause it is based on the TVI, the [ALTV] Index Account provides you with the opportunity to receive index interest credits in times when an index crediting option based on equity or bond markets would not." This statement is false and misleading. The imposition of a 5-year term makes the ALTV Index less advantageous than an annual point-to-point stock or equity index because the 0% floor applied to more traditional annual point-to-point interest crediting options operates to exclude negative annual returns as the index reference point is reset each year, while the 5-year term applicable to the ALTV Index incorporates interim negative returns in determining the applicable interest credit at the end of the Index Term.

If a bond index were chosen, there is no scenario under which the ALTV Index would provide an interest credit when the fixed interest index would not. If an equity index were chosen, there has been no time in history when an annual equity crediting method would not have generated a positive interest credit over a 5-year term.

86. Perhaps the most glaring omission of the Security Benefit SOU is its utter failure to disclose or describe the actual composition of the assets underlying the ALTV Index. The SOU states only that the ALTV Index is based on the Trader Vic Index, which "measures the movements in prices of futures contracts on physical commodities, global currencies and U.S. interest rates that are publicly traded on a U.S. exchange that publishes the contracts' daily settlement prices." The SOU fails to disclose, however, that the futures contracts tracked by the Trader Vic Index are concentrated in commodities and currencies having an expected near-zero return and to the extent a minor portion of the indexed futures are tied to interest rates, any potential return exceeding the risk-free rate is offset by the spreads and charges exacted by the Royal Bank of Scotland and Security Benefit.

87. In fact, the SOU not only fails to disclose the foregoing critical facts, it affirmatively misrepresents that the non-correlation of the ALTV Index to equity and bond markets is a positive feature without disclosing that attribute is a drag on future returns for the Total Value Annuities. The SOU states that "[b]ecause the TVI is based on the 24 futures contracts on commodities, global currencies and U.S. interest rates, the daily values of the TVI are likely to be independent from the price movement of equity and bond indices." Such non-correlation in fact results in lower returns because, as alleged above, the non-correlated futures contracts are concentrated in asset classes producing expected returns no higher or little higher than the risk-free rate attainable through treasuries.

### 2. The SOU for the MSDA Index

88. The Security Benefit SOU for the MSDA Index is similarly misleading. Like the description of the ALTV Index, the Security Benefit SOU description of the MSDA Index fails to disclose any information concerning the actual or anticipated allocation of the asset classes

underlying the index. The SOU states only that the MSDA Index "consists of U.S.-listed Exchange Traded Funds which track four distinct asset classes: (1) Equities, (2) Bonds, (3) Short-Term Treasuries and (4) Alternatives. The allocation among the asset classes is determined by the rules-based strategy."

89. The SOU fails to disclose that, over the past two decades, the MSDA Index on average has allocated ***only about 15% or so*** of the underlying asset classes to equities, with the balance allocated to short-term treasuries, bonds and commodities with expected returns no higher than the risk-free rate or, respectively, near zero. And once again, any meager expected future returns are then offset by spreads and other charges at the index or annuity level.

90. In addition, just as with respect to the ALTV Index, the SOU falsely misstates the true nature and impact of the volatility control overlay, because the Secure Income Annuities have a 0% floor on the credited interest rate, while the volatility control reduces the positive impact of an increase in the value of the MSDA. The MSDA SOU misleadingly suggests that the volatility control overlay has a symmetrical impact on performance of the MSDA Index credits when it does not.

3. **The SOU for the HD Plus Index**

91. The Security Benefit SOU for the HD Plus Index is also misleading. Like the description of the ALTV and MSDA Indices, the Security Benefit SOU description of the HD Plus Index fails to disclose any information concerning the actual or anticipated allocation of the asset classes underlying the index.

92. The SOU further fails to disclose that the HD Plus Index was only launched in July 2014 and had no demonstrated performance record from which annuity owners could make any assessments regarding the risks or benefits of allocating any portion of their account value to it. Further, just like the ALTV Index, the SOU for the HD Plus Index fails to disclose or explain the true impact and nature of the volatility overlay, nor does it explain that it is an excess return index such that the actual returns will be reduces by both the index cost spread and also by an additional amount corresponding to the risk free rate of return.

## RICO ALLEGATIONS

### A. The Security Benefit Annuity Enterprise

93. Plaintiff and class members are each "persons" within the meaning of 18 U.S.C. 1961(3), and each of them has sustained injury to their business or property as a result of the acts and the conduct of Security Benefit described herein.

94. Based upon Plaintiff's current knowledge, the following group of individuals associated in fact (which Plaintiff refers to as the "Security Benefit Annuity Enterprise" ("SBAE") is responsible for the creation, marketing, solicitation, and sale of the Annuities (and Synthetic Indices) to the general public, and therefore constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4): Security Benefit, who underwrites and issues the Annuities and who participated in the creation of the Synthetic Indices; Advisors Excel, who partnered with Security Benefit to develop the Annuities and to market them through an exclusive network of four "elite" marketing organizations, including Advisors Excel, Creative Marketing, Gradient Financial and Impact Partnership; Innovation Design Group, who are contracted to sell the Annuities; Alpha Artists LP which holds an exclusive license to distribute the ALTV Index; Guggenheim; Todd Boehly, the Chairman of Security Benefit; and Cody Foster, co-founder of Advisors Excel. Although not formally included in the SBAE, thousands of advisors and producers who contracted with the marketing organizations just mentioned also participated in the scheme.

95. The SBAE is an ongoing and continuing organization consisting of both corporations (outside of Security Benefit) and individuals associated for the common or shared purpose of selling, promoting, or marketing the Annuities and Synthetic Indices specifically targeting their deceptive and fraudulent plan directly to Plaintiff and the Class, through deceptive and misleading sales tactics or materials, and deriving profits from those activities at the expense of and to the detriment of Plaintiff and class members.

96. While Security Benefit and the other members of the SBAE are members and a part of the SBAE, they also have an existence separate and distinct from the SBAE, and each of these entities are "persons" as defined by 18 U.S.C. § 1961(3).

97. The SBAE engages in and affects interstate commerce because it involves activities across state boundaries, such as the marketing, promotion, advertisement, and sale of the Annuities and Synthetic Indices, and the receipt of premiums, fees, commissions, and surrender charges from the sale of the Annuities.

98. Within the SBAE there is a common communication network by which co-conspirators share information on a regular basis. The SBAE uses this common communication network for the purpose of marketing, soliciting, and selling the Annuities and the Synthetic Indices.

99. The SBAE has a systematic linkage because there are contractual relationships, financial ties, and continuing coordination of activities. Through the SBAE, Security Benefit and other participants engage in consensual decision making to implement their fraudulent scheme and to function as a continuing unit for the common purpose of exacting payments, surrender charges, and premium dollars. Furthermore, the SBAE functions as a continuing unit with the purpose of assisting with perfecting and furthering their wrongful scheme to market and sell Security Benefit's Annuities and to induce annuity owners to allocate their account value to the Synthetic Indices.

100. To successfully market and sell the Annuities and to induce annuity owners to allocate their account value to the Synthetic Indices, Security Benefit required a systematic means to control the substantive information prospective purchasers receive at the point of sale, including concealing the fact that the Synthetic Indices were designed to produce near-zero returns, or that any meager returns would be practically wiped out once the spreads and costs for the Annuities were taken into account, or that the premiums annuity owners paid into the Annuities would be locked up for years or else they would incur substantial losses through market value adjustments and surrender charges. The SBAE provides Security Benefit with a system and the ability, and

their control of and participation in it is necessary for the successful operation of its scheme. Security Benefit exercises substantial control over the SBAE by:

a. Designing and issuing the Annuities, which were represented as being "uncapped" and allowing full participation although they were designed to achieve near-zero returns;

b. Designing and developing the Synthetic Indices;

c. Developing uniform sales and marketing materials (including false and misleading illustrations which utilized hypothetical "backcasting" to misrepresent the Synthetic Indices' future performance, as well as the misleading SOUs that were rife with omissions and failed to disclose material information about the Synthetic Indices), standardized annuity contracts, high-pressure sales techniques and scripted sales presentations designed to push the Annuities and allocations of annuity owners' account values to the Synthetic Indices;

d. Directing and controlling Security Benefit's sales force's strict adherence to and use of standardized sales materials, uniform sales techniques and presentations developed and authorized by Security Benefit to market and sell the Annuities and to hype the Synthetic Indices;

e. Developing and implementing a comprehensive sales incentive program which rewarded sales agents with perks and high commissions for selling the Annuities and inducing annuity owners to allocate their account values to the Synthetic Indices;

f. Accepting applications for and issuing the Annuities with account value allocations to the Synthetic Indices; and

g. Imposing, causing to be imposed, or collecting improper annuity charges from Plaintiff and other class members upon their surrender of all or part of the Annuities.

101. As set forth above, the SBAE has an ascertainable structure separate and apart from the pattern of racketeering activity in which Security Benefit engages. For instance, the SBAE operations include the marketing, solicitation, and sale of various other types of Security Benefit annuity products which are not based on allocation to the Synthetic Indices. Despite the availability

of other annuity products and the availability of non-proprietary indices to which annuity owners could allocate their account values, Security Benefit has exerted control and dominance over the operations of the SBAE for the purpose of furthering its unlawful scheme of marketing and selling the Annuities and inducing annuity owners to allocate their account value to the Synthetic Indices.

102. At all material times, each participant in the SBAE was aware of the scheme to market and sell the Annuities and to induce the annuity owners to allocate their account values to the Synthetic Indices, was a knowing and willing participant in the scheme, and reaped profits therefrom.

103. Security Benefit has directed and controlled the ongoing organization necessary to implement its scheme and illicit business practices at meetings and through communications of which Plaintiff cannot now know because Security Benefit has all such information.

**B. RICO Conspiracy**

104. Security Benefit and the other participants in the SBAE have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

105. Security Benefit and the other participants in the SBAE have engaged in a conspiracy to increase premium revenue for Security Benefit and to generate additional revenue for the participants in the SBAE marketing and selling the Annuities and distributing the Synthetic Indices.

106. The objects of the conspiracy are to specifically target and induce prospective purchasers in Florida and across the country, to purchase the Annuities and to allocate their account values to accounts tracking the Synthetic Indices that were designed to produce near-zero returns; to maximize sales of the Annuities for Security Benefit; and to maximize the revenues of Security Benefit and the other participants in the SBAE.

107. To achieve these goals and to ensure uniformity, the sales illustrations and marketing brochures are all prepared by Security Benefit and distributed to prospective purchasers through sales agents or brokers who use these marketing materials to sell the Annuities. The other

participants in the SBAE agreed to market and sell the Annuities although they knew they were designed to produce near-zero returns for annuity owners, and used deceptive and unconscionable methods to secure such sales and commissions. Security Benefit and its co-conspirators also agreed to participate in other illicit and fraudulent practices, all in exchange for agreement and participation in the conspiracy.

108. Security Benefit and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in inducing the trust of prospective purchasers and persuading them to purchase the Annuities and to allocate their account values to track the Synthetic Indices while knowing that such investment vehicles were designed solely to benefit Security Benefit and its cohorts to the detriment of the annuity owners.

109. There are many instances of common conduct that evinces the conspiracy amongst Security Benefit and the SBAE participants and co-conspirators, including but not limited to the use of uniform sales illustrations, SOUs and other marketing materials promoting the Annuities and the Synthetic Indices to induce prospective purchasers to purchase them.

110. As a result of the conspiracy, Plaintiff Clinton and class members made payments for the Annuities beyond what they would have otherwise.

**C. Predicate Acts**

111. Section 1961(1)(B) provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Security Benefit has and continues to engage in conduct violating both of these specific predicate acts and laws to effectuate its scheme.

112. In addition, to effectuate their scheme, Security Benefit and each of the other participants in the SBAE sought to and did aid and abet the others in violating § 1341 and § 1343 within the meaning of 18 U.S.C. § 2. Accordingly, their conduct is indictable under 18 U.S.C. §§ 1341 and 1343 on this additional basis.

1. **Violations of 18 U.S.C. §§ 1341 and 1343**

113. For the purpose of executing or attempting to execute the above-described fraudulent scheme to market and sell the Annuities and to induce annuity owners to allocate their account value to accounts tracking the Synthetic Indices by means of false pretenses, representations, or promises, Security Benefit, in violation of 18 U.S.C. § 1341, placed in post offices or in authorized repositories matters and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the United States Postal Service or commercial interstate carriers, including but not limited to marketing brochures for the Annuities, performance illustrations, applications, contracts, sales presentation scripts, training manuals and videotapes, correspondence, annuitant leads lists, annuity payments, premium payments, commissions, websites, reports, data, summaries, statements, and other materials relating to the marketing and sale of the Annuities.

114. For the purpose of executing or attempting to execute the above-described scheme to defraud or to obtain money by means of false pretenses, representations, or promises, Security Benefit, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things including but not limited to marketing brochures for the Annuities, performance illustrations, applications, contracts, sales presentation scripts, training manuals and videotapes, correspondence, annuitant leads lists, annuity payments, premium payments, commissions, websites, reports, data, summaries, statements, and other materials relating to the marketing and sale of the Annuities.

115. The matters and things sent by Security Benefit via the U.S. Mail, commercial carrier, wire, or other interstate electronic media as identified above include thousands of communications to perpetuate and maintain the scheme, including, among other things:

a. False and fraudulent representations that the Annuities are "uncapped" retirement products with unlimited participation in the performance of the Synthetic Indices, which Security Benefit falsely represented would provide above-market, long-term returns while purportedly protecting annuity owners from market volatility;

b. Uniform false and fraudulent sales illustrations, SOUs, and other marketing materials promoting Security Benefit's Annuities and the Synthetic Indices to induce prospective purchasers to purchase them;

c. Information regarding potential purchasers of the Annuities;

d. Information regarding processing applications for the Annuities, and receiving premium payments from the annuity holders; and

e. Invoices and payments related to Security Benefit's fraudulent scheme, including transfer of funds between Security Benefit and the other participants in the SBAE.

116. Security Benefit's corporate headquarters have communicated by interstate mail, wire, email, and facsimile with various regional offices and subsidiaries, divisions and other insurance entities in furtherance of their schemes.

117. Security Benefit's virtually uniform misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purposes of deceiving Plaintiff Clinton and class members and wrongfully obtaining their money and property for Security Benefit's gain.

118. Security Benefit either knew or recklessly disregarded the fact that the misrepresentations and omissions described above and incorporated herein were material to Plaintiff and class members, as evidenced by the substantial payments for the Annuities. Plaintiff's and class members' purchases of the Annuities proves the success of Security Benefit's scheme.

119. Absent Security Benefit's fraudulent and materially misleading communications making the virtually uniform misrepresentations and omissions described above and incorporated herein, Security Benefit never would have sold the Annuities or obtained premium payments from Plaintiff Clinton and class members.

120. As a result, Security Benefit has obtained money and property belonging to Plaintiff and class members, who have been injured in their business or property by Security Benefit's overt acts of mail and wire fraud, and by Security Benefit's and the SBAE participants' aiding and abetting each other's acts of mail and wire fraud.

### D. Pattern of Racketeering Activity

121. Security Benefit engaged in a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least 2 acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past 10 years. In fact, Security Benefit and the other participants in the SBAE each have committed or aided and abetted each other in the commission of thousands of acts of racketeering activity. Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiff Clinton and class members.

122. The multiple acts of racketeering activity which defendant committed or conspired to, or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

### E. RICO Violations

123. As a direct and indirect result of Security Benefit's conduct as described above, substantial income was generated and received by and came under the control of Security Benefit. Security Benefit used that income to establish or operate the SBAE as described herein, which was engaged in interstate or foreign commerce. Therefore, Security Benefit violated 18 U.S.C. § 1962(a).

124. Security Benefit, through conduct described above, acquired, maintained, and exercised control over the SBAE, which was engaged in or affected interstate or foreign commerce. Therefore, Security Benefit has violated 18 U.S.C. § 1961(2)(b).

125. Security Benefit and each of the participants in the SBAE owned, operated, or controlled by it, willfully agreed to, and did materially participate, directly or indirectly, in the affairs of the SBAE through a pattern of racketeering activity comprised of numerous acts of mail and wire fraud, and therefore violated 18 U.S.C. § 1962(c).

126. Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Security Benefit's conspiracy with the other participants in the SBAE to defraud Plaintiff Clinton and class members of their money and property from the sale of the Annuities pursuant to the scheme described above violates 18 U.S.C. § 1962(d).

## PLAINTIFF-SPECIFIC ALLEGATIONS

127. In August 2015, Security Benefit targeted and specifically induced Plaintiff Clinton in Florida to purchase five Total Value Annuities for $100,000.00 each (for a total of $500,000.00), based on the represented advantages and illustrated performance of that Annuity compared to other annuities and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the HD Plus Index. The mail and wires were utilized by the SBAE to make these false representations.

128. Security Benefit issued the Secure Income Annuities (No. xxxxxx7001, No. xxxxxx7002, No. xxxxxx7003, No. xxxxxx7004, and No. xxxxxx7005) to Plaintiff Clinton on August 14, 2015.

129. In direct reliance on the represented terms of the Secure Income Annuity contract, Plaintiff Clinton immediately allocated 100% of her account value to the BNP Paribus High Dividend Plus 2-Year Point to Point Account (the "HD Plus Account"), which Security Benefit promoted as having no cap and 100% participation. The HD Plus Account has a two-year Index Term.

130. As confirmed by her 2017 Annual Statement, for the two-year period between August 14, 2015, and August 14, 2017, Security Benefit credited Plaintiff Clinton with interest in the HD Plus Account at the rate of 0.00%, consistent with the true expected performance of the HD Plus Index for the reasons alleged above.

131. In September 2017, Plaintiff Clinton reallocated her account value to reduce her participation in the HD Plus Index to 25% of her account value. Plaintiff Clinton cancelled her contract in September 2018, incurring substantial fees and surrender charges.

132. In sum, the Total Value Annuity has not only cost Plaintiff Clinton the lost use of more than $500,000, but also was worth less than she paid for it on the date of issuance, causing her to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions. Moreover, Plaintiff Clinton incurred substantial losses through market value adjustments, surrender charges, and bonus claw-pack penalties as a result of cancelling the contract she was induced to enter into through Security Benefit's various misrepresentations and omissions.

**F. Accrual of Plaintiff's Claims under the Discovery Rule**

133. As alleged above, the operation of the Annuities and the Synthetic Indices are exceptionally complex instruments, which Security Benefit described in an opaque, incomplete and misleading manner, obfuscating the operative provisions through a maze of complicated and interrelated defined terms.

134. The true nature and operation of the Annuities and Synthetic Indices and the structure of the Annuities are so complicated that no reasonable person would have known of Security Benefit's wrongful conduct at the time of sale, let alone that such conduct had caused her injury at the point of sale.

135. Plaintiff did not know, nor was she in any position to discover before she retained counsel, the nature of Security Benefit's wrongful conduct nor the harm that it worked upon her.

**G. Fraudulent Concealment and Equitable Tolling**

136. Alternatively, Security Benefit is by its own wrongful conduct – which was intended to and did obfuscate the deceptive nature and operation of the Synthetic Indices – precluded from asserting any limitations defense against Plaintiff under the fraudulent concealment doctrine.

137. Among other things, Security Benefit structured the Annuities using the Synthetic Indices to credit interest only at the end of the specified Index Term. This structure operated to conceal from annuity owners that the Annuities would not perform as illustrated until the end of the applicable Index Term. As observed on one industry forum, "if your client ever asks how they

[Synthetic Indices] are doing, you will never really know a good answer until their 5th anniversary."[9]

138. Security Benefit also intentionally restricted sale of the Annuities to a small group of tightly controlled independent marketing organizations, some of which were active participants in the fraudulent scheme alleged herein, to avoid disclosure of the fraudulent and misleading practices.

139. In furtherance of its actions to fraudulently conceal its wrongful conduct, Security Benefit developed a subsequent series of interest crediting options that it launched as new alternative "improved" index options to deflect any suspicions when the Synthetic Indices failed to deliver the promised returns.

140. To this day, Security Benefit continues to fraudulently conceal the wrongful conduct described herein from the class members and the general public. Security Benefit has refused to disclose or provide information about its practices in a way that Plaintiff or the class members could have discovered. Although the initial decisions to perpetrate the fraudulent course of conduct alleged herein were made years ago, Security Benefit has continued its active concealment of those fraudulent practices.

141. Security Benefit's wrongful conduct is continuing in nature. There is a substantial nexus between the fraudulent conduct that has occurred within the applicable limitations periods and Security Benefit's misconduct prior to that time. The wrongful acts involve the same types of illicit practices and are part of a recurring, continuous series of events.

142. The statute of limitations applicable to the claims alleged by Plaintiff and on behalf of the class members as a result of the conduct alleged herein have been tolled as a result of Security Benefit's fraudulent concealment.

## CLASS ACTION ALLEGATIONS

---

9 https://insurance-forums.com/community/threads/annuity-linked-tvi-index-by-security-benefit.47690/ (last visited on November 16, 2019).

143. This action is brought by Plaintiffs individually and on behalf of the following Nationwide RICO Class and Florida Unjust Enrichment Subclass pursuant to Rule 23(a), (b)(2), and (b)(3), *Federal Rules of Civil Procedure*:

**Nationwide RICO Class:**
All persons who owned a Secure Income or Total Value Annuity from Security Benefit that was issued within the applicable limitations period, who resided in the United States at the time the Annuity was issued, and who received an illustration on or before the date of annuity application.

Excluded from the Class are: (i) individuals who are or were during the Class Period officers or directors of the Defendant or any of its respective affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; and, (iii) all class members who file a timely and proper request to be excluded from the Class.

**Florida Unjust Enrichment Subclass:**
All persons who owned a Secure Income or Total Value Annuity from Security Benefit that was issued within the applicable limitations period, who resided in the Florida at the time the Annuity was issued, and who received an illustration on or before the date of annuity application.

Excluded from the Class are: (i) individuals who are or were during the Class Period officers or directors of the Defendant or any of its respective affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; and, (iii) all class members who file a timely and proper request to be excluded from the Class.

144. Plaintiff reserves the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

145. Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**A. Numerosity**

146. There are thousands of members in the Class and Subclass described above and are thus so numerous that joinder of all members is impracticable. The identities and addresses of the members of the Class and Subclass can be readily ascertained from business records maintained

by Security Benefit. The precise number of Class and Subclass members for the classes numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. The names and addresses of all members of the Class and Subclass are contained in the business records maintained by Security Benefit and are readily available to Security Benefit. The members of the Class and Subclass are readily and objectively identifiable, and membership readily ascertainable. Plaintiffs contemplate that notice will be provided to members of the Class and Subclass by e-mail and direct mailed notice. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

**B. The Commonality of Questions of the Law and Fact**

147. The claims of Plaintiff and the members of the Class and Subclass involve common questions of law and fact arising out of Security Benefit's alleged fraudulent scheme, including:

a. Whether Security Benefit improperly solicited, referred, marketed, issued, or sold the Annuities to Plaintiff and Class members;

b. Whether Security Benefit engaged in mail or wire fraud;

c. Whether Security Benefit engaged in a pattern of racketeering activity;

d. Whether the SBAE is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

e. Whether Security Benefit conducted or participated in the affairs of the SBAE through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

f. Whether Security Benefit and other participants in the SBAE conspired to commit violations of the racketeering laws in violation of § 1962(d);

g. Whether Security Benefit was unjustly enriched at the expense of Plaintiff and the Subclass;

h. Whether Plaintiffs and the other members of the Classes are entitled to equitable relief against Security Benefit, and if so in what form; and

i. Whether Plaintiffs and the other members of the Classes are entitled to damages, and if so in what amount.

**C. Typicality of the Claims or Defenses of the Class Representatives**

148. Plaintiff is a member of the Class and Subclass she seeks to represent. Plaintiff's claims are typical of the claims and defenses of the other members of the Class and Subclass because of the similarity, uniformity, and common purpose of Security Benefit's unlawful conduct. Each Class and Subclass member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

**D. Adequacy of Representation**

149. Plaintiff is willing and prepared to serve the Court and the proposed Class and Subclass in a representative capacity. Plaintiff will fairly and adequately protect the interests of the Class and Subclass and has no interest that is adverse to, or which materially and irreconcilably conflicts with, the interests of the other members of the Class and Subclass.

150. Plaintiff has engaged the services of legal counsel indicated below who are experienced in complex class litigation and life insurance matters, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiff and the other members of the putative Class and Subclass.

**E. Rule 23(b)(2) Certification**

151. Under Rule 23(b)(2), a plaintiff may maintain a class where the defendant has acted in a manner applicable to the entire class, making injunctive or declaratory relief appropriate.

152. This action is appropriate as a class action pursuant to Rule 23 (b)(2) because Plaintiff seeks injunctive relief and corresponding declaratory relief for the benefit of the Class. Security Benefit has acted in a manner generally applicable to each member of the Class by utilizing the standardized contract forms and same standardized illustrations for all.

153. Security Benefit's actions, if not enjoined, will subject Plaintiffs and other members of the Class to continuing future harm and will cause irreparable injuries to them, denied as they

are to access to their funds under the terms of the wrongfully induced Annuities. The adverse financial impact of Security Benefit's unlawful actions is continuing and, unless permanently enjoined will continue to irreparably injure Plaintiff and the other members of the Class.

**F. Rule 23(b)(3) Certification**

154. Rule 23(b)(3) allows for class actions when necessary to achieve economies of time, effort, and expenses, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

155. The common issues of law and fact raised in this action readily predominate over any questions affecting only individual members of the Classes.

156. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

a. Few, if any, members of the Classes could afford to seek legal redress individually for the wrongs that Security Benefit has committed against them, and absent members have no substantial interest in individually controlling the prosecution of individual actions;

b. Once Security Benefit's liability has been adjudicated with respect to the truthfulness of the uniform contract representations and illustrations as to Plaintiffs, the claims of all members of the Classes can be determined by the Court;

c. This action will ensure an orderly and expeditious administration of the Classes' claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

d. Without a class action, many members of the Classes would continue to suffer injury, and Security Benefit's violations of law will continue without redress while it continues to reap and retain the substantial proceeds and reductions in its future liabilities derived from its wrongful conduct; and

e. This action does not present any undue difficulties that would impede its management by the Court as a class action.

**G. Superiority**

157. A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**COUNT I**

**Violation of RICO, 18 U.S.C. § 1962(c)**

*(against Security Benefit on behalf of Plaintiff and the Nationwide Class)*

158. Plaintiff realleges and incorporates paragraphs 1–157 above as if fully set forth herein and further alleges as follows.

159. At all relevant times, Defendant was employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

160. The SBAE which engaged in, the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included, but is not limited to: Security Benefit, who underwrites and issues the Annuities and who participated in the creation of the Synthetic Indices; Advisors Excel, who partnered with Security Benefit to develop the Annuities and to market them through an exclusive network of four "elite" marketing organizations, including Advisors Excel, Creative Marketing, Gradient Financial and Impact Partnership; Innovation Design Group, who are contracted to sell the Annuities; Alpha Artists LP which holds an exclusive license to distribute the ALTV Index; Guggenheim; Todd Boehly, the Chairman of Security Benefit; and Cody Foster, co-founder of Advisors Excel. Although not

formally included in the SBAE, thousands of advisors and producers who contracted with the marketing organizations just mentioned also participated in the scheme.

161. The members of the SBAE had a common or shared purpose of selling, promoting, or marketing the Annuities and Synthetic Indices to Plaintiff and the Class through deceptive and misleading sales tactics or materials, and deriving profits from those activities at the expense of and to the detriment of Plaintiff and class members. Security Benefit shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme with the other participants in the SBAE.

162. The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

163. Security Benefit conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

164. As explained above, Security Benefit directed and controlled the enterprise as follows:

a. Designing and issuing the Annuities, which were represented as being “uncapped” and allowing full participation although they were designed to achieve near-zero returns;
b. Designing and developing the Synthetic Indices;
c. Developing uniform sales and marketing materials (including false and misleading illustrations which utilized hypothetical “backcasting” to misrepresent the Synthetic Indices’ future performance, as well as the misleading SOUs that were rife with omissions and failed to disclose material information about the Synthetic Indices), standardized annuity contracts, high-pressure sales techniques and scripted sales presentations designed to push the Annuities and allocations of annuity owners’ account values to the Synthetic Indices;

d. Directing and controlling Security Benefit's sales force's strict adherence to and use of standardized sales materials, uniform sales techniques and presentations developed and authorized by Security Benefit to market and sell the Annuities and to hype the Synthetic Indices;

e. Developing and implementing a comprehensive sales incentive program which rewarded sales agents with perks and high commissions for selling the Annuities and inducing annuity owners to allocate their account values to the Synthetic Indices;

f. Accepting applications for and issuing the Annuities with account value allocations to the Synthetic Indices; and

g. Imposing, causing to be imposed, or collecting improper annuity charges from Plaintiff and other class members upon their surrender of all or part of the Annuities.

165. As part of and in furtherance of the scheme to defraud, Security Benefit made numerous material omissions and misrepresentations to Plaintiff and Class members with intent to defraud and deceive Plaintiff and Class members.

166. For example, Security Benefit and its associates prepared and disseminated uniform sales illustrations and marketing materials promoting their Annuities and the Synthetic Indices to induce prospective purchasers to purchase them. The Security Benefit sales illustrations and marketing brochures were designed to steer purchasers to the index option accounts linked to the Synthetic Indices by representing that the potential returns for account values allocated to the "uncapped," 100% participation Synthetic Indices are substantially higher than the returns on account values allocated to the "capped" S&P 500 index option. Defendants engaged in similar conduct as to all Class members.

167. However, Security Benefit never discloses in its uniform sales illustrations that the Synthetic Indices are not established reference indices, like the S&P 500. To the contrary, they are proprietary "indices" employed by Security Benefit as a mechanism to depict inflated, unattainable future returns using the artifice of purported "uncapped" 100% participation. Security Benefit intentionally employed the Synthetic Indices as a fraudulent artifice to overstate and misrepresent

the projected future performance of the Annuities and to intentionally induce prospective purchasers and owners of the Annuities to allocate their Account Values to the Synthetic Indices.

168. Security Benefit knowingly and intentionally fostered the mistaken belief that the "uncapped," 100% participation feature of the Synthetic Indices would potentially generate outsized above-market returns – with projected annual returns as high as 8% or higher – far exceeding the comparative performance of crediting options based on "capped" indices like the S&P 500.

169. Moreover, as explained above, Security Benefit provided Plaintiff Clinton with an SOU that failed to disclose any information concerning the actual or anticipated allocation of the asset classes underlying the Synthetic Indices, failed to disclose or explain the true impact and nature of the volatility overlay, nor did it explain that the Synthetic Indices for the Total Value Annuities she purchased were excess return indices such that the actual returns would be further reduced by both the index cost spread and also by an additional amount corresponding to the risk free rate of return. Plaintiff Clinton received an SOU in the mail on or about August 2015.

170. Security Benefit had a duty to correct these misstatements and mistaken impressions. These misrepresentations and omissions were material, as they helped Security Benefit advance its scheme to sell Plaintiff Clinton the Annuities and to induce her to allocate her account value to the Synthetic Indices, and were designed to lull Plaintiff and the Class into believing that the Annuities would provide above-market, long-term returns while purportedly protecting Plaintiff and Class members from market volatility.

171. The misrepresentations and omissions were material, as Plaintiff Clinton and Class members would not have purchased the Annuities had Defendants disclosed that the Synthetic Indices were not established reference indices like the S&P 500, or that to achieve the unattainably high future returns depicted in its illustrations and marketing materials, Security Benefit used "backcasting" to project future returns based on the non-representative historical performance of a hypothetical collection of assets to a past period beginning years ***before the Synthetic Indices***

***even came into existence***. Illustrations containing these misrepresentations and omissions were mailed to Plaintiff Clinton on or about July 13, 2015.

172. For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the illustrations and SOUs described above, falsely portraying the Annuities to Plaintiff and Class members as "uncapped" retirement products with unlimited participation in the performance of the Synthetic Indices, which would provide above-market, long-term returns while purportedly protecting Plaintiff and Class members from market volatility.

173. Further, the predicate acts also included Plaintiff Clinton's transfers of $500,000.00 in funds to purchase the Annuities on or about August 2015. Around the same time, Security Benefit transferred or caused to be transferred commission payments to the advisor who sold her the Annuities.

174. This scheme to defraud proximately injured Plaintiff and Class members because it prevented them from making an informed decision regarding whether to purchase the Annuities. Had Plaintiff and Class members known the truth regarding Security Benefit's grossly misleading performance illustrations regarding the Synthetic Indices, or had they been adequately informed about the creation, operation, and management of the Annuities and the Synthetic Indices, they would not have purchased the Annuities, would have allocated their account values to a traditional index like the S&P 500, or would have invested their money elsewhere. Defendants also transferred sums among themselves, including but not limited to fees and commissions in furtherance of their scheme to defraud Plaintiff and Class members, in violation of the wire fraud statutes.

175. By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class members in the form of, among other things, the lost use of the premiums paid for the Annuities, which were also worth less than they paid for them on the date of issuance, as well as incurring

substantial losses through market value adjustments, surrender charges, and bonus claw-pack penalties.

176. In addition, as set forth above, Security Benefit's RICO violations are ongoing and will continue absent declaratory, injunctive or other equitable relief. Section 1964(a) authorizes this Court to issue appropriate orders to provide Plaintiff Clinton and the Class equitable relief, including but not limited to entering a declaration and enjoining Security Benefit's from continuing their violations of Section 1962.

**COUNT II**
**Violation of RICO, 18 U.S.C. § 1962(d)**
*(against Security Benefit on behalf of the Nationwide Class)*

177. Plaintiff realleges and incorporates paragraphs 1–176 above as if fully set forth herein and further alleges as follows.

178. At all relevant times, Security Benefit was associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d). Security Benefit agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

179. Security Benefit illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, among other things:

a. Agreeing with the other participants in the SBAE to market and sell the Annuities although they knew they were designed to produce near-zero returns for annuity owners, and used deceptive and unconscionable methods to secure such sales;

b. Agreeing to the overall objectives of the conspiracy and participating in the common course of conduct to commit acts of fraud and indecency in inducing the trust of prospective purchasers and persuading them to purchase the Annuities and to allocate their account values to track the Synthetic Indices while knowing that such investment vehicles were designed solely to benefit Security Benefit and its cohorts to the detriment of the annuity owners; and

c. Agreeing to commit two or more predicate acts as described above in Count I.

180. Security Benefit committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

181. As a result of Security Benefit's violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members suffered damages in the form of, among other things, the lost use of the premiums paid for the Annuities, which were also worth less than they paid for them on the date of issuance, as well as incurring substantial losses through market value adjustments, surrender charges, and bonus claw-pack penalties.

182. In addition, as set forth above, Security Benefit's RICO violations are ongoing and will continue absent declaratory, injunctive or other equitable relief. Section 1964(a) authorizes this Court to issue appropriate orders to provide Plaintiff Clinton and the Class equitable relief, including but not limited to entering a declaration and enjoining Security Benefit's from continuing their violations of Section 1962.

## COUNT III
## UNJUST ENRICHMENT
*(against Security Benefit on behalf of Plaintiff and the Florida Subclass)*

183. Plaintiff realleges and incorporates paragraphs 1–157 above as if fully set forth herein and further alleges as follows.

184. By engaging in the wrongful scheme to market and sell Security Benefit's Annuities and to induce annuity owners to allocate their account value to the Synthetic Indices, Security Benefit, and others it owned, operated, or controlled, obtained payments from Plaintiff and the Florida Subclass in the form of annuity premiums, commissions, service charges, surrender charges, and other fees, which were based on the misleading and fraudulent uniform illustrations, SOUs, and other sales presentations and marketing materials, as detailed above.

185. Plaintiff and the Florida Subclass therefore conferred upon Security Benefit non-gratuitous payments, which Security Benefit appreciated, accepted, or retained with full

knowledge and awareness that those benefits were conferred as a result of Security Benefit's misleading and fraudulent uniform illustrations, SOUs, and other sales presentations and marketing materials, as detailed above.

186. As a result of the relationships between the parties and the facts stated above, Security Benefit will be unjustly enriched if it is permitted to retain such funds. Under common law principles of unjust enrichment, Security Benefit should not be permitted to retain the benefits of this unjust enrichment.

187. Therefore, a constructive trust should be established over the money Plaintiff and Florida Subclass members paid to Security Benefit, including annuity premiums, commissions, service charges, surrender charges, and other fees, expenses, and other charges imposed by Security Benefit and its agents.

188. Further, because Security Benefit's retention of the non-gratuitous benefits conferred by Plaintiff and the Florida Subclass is unjust and inequitable, and because Plaintiff and the Florida Subclass have no adequate remedy at law, Plaintiff and the Florida Subclass are entitled to, and hereby seek damages in an amount to be established at trial.

**PRAYER FOR RELIEF**

Plaintiff Ella Clinton, on behalf of herself and all others similarly situated, demands judgment against Defendant as follows:

1. Declaring this action to be a proper class action maintainable pursuant to Rule 23(a), (b)(2), or (b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and her counsel to be a representative of the Class;

2. Enjoining Security Benefit from continuing the acts and practices described above;

3. Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute;

4. Imposition of a constructive trust, an order granting rescissionary and injunctive relief, or such other equitable relief, including restitution and an order for disgorgement of ill-gotten profits; and

5. Awarding such other and further relief the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial of all issues so triable.

Dated: November 20, 2019.

By: *s/ Adam Moskowitz*
Adam Moskowitz, Esq.
Florida Bar No. 984280
adam@moskowitz-law.com
Howard M. Bushman, Esq.
Florida Bar No. 0364230
howard@moskowitz-law.com
Joseph M. Kaye, Esq.
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza
Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

*Counsel for Plaintiff and the Class*